# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGIE RENFRO,<br><br>            Plaintiff,<br><br>      v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>          Defendant. | Case No. 1:17-cv-01406-SAB<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 10, 12, 13) |

## I.

## INTRODUCTION

Plaintiff Margie Renfro ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from depression, posttraumatic stress disorder, hypertension, hyperlipidemia, hypothyroidism, mild sensory hearing, loss in both ears, mild right carpal tunnel syndrome, mild cervical degenerative joint disease, history of lateral epicondylitis, and morbid obesity. For the reasons set forth below, Plaintiff's motion for summary judgment shall be denied and Defendant's cross-motion for summary judgment shall be granted.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 5, 7.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on December 2, 2013.  (AR 70.)  Plaintiff's application was initially denied on April 14, 2014, and denied upon reconsideration on May 28, 2014.  (AR 82-85, 91-95.)  Plaintiff requested and received a hearing before Administrative Law Judge Sharon L. Madsen ("the ALJ").  Plaintiff appeared for a hearing on May 26, 2016.  (AR 36-60.)  On July 26, 2016, the ALJ found that Plaintiff was not disabled.  (AR 17-30.)  The Appeals Council denied Plaintiff's request for review on August 21, 2017.  (AR 1-3.)

### A.    Relevant Hearing Testimony

Plaintiff appeared and testified at the May 26, 2016 hearing with counsel.  (AR 38.)  Plaintiff was born on November 30, 1950.  (AR 39.)  Plaintiff has been on Social Security since she was sixty-two.  (AR 54.)  She was 5 feet 6 inches tall and weighed 225 pounds at the time of the hearing.  (AR 39.)  Plaintiff is single and has no children.  (AR 39.)  She lives in a house with her four dogs.  (AR 39-40.)  Plaintiff has a high school education and has taken college courses in real estate.  (AR 40.)

Plaintiff drives.  (AR 40.)  Plaintiff does not need help with showering or dressing.  (AR 40.)  Plaintiff does household chores, but paces herself.  (AR 40.)  Plaintiff cooks and does her own grocery shopping.  (AR 40-41.)  She goes to church but used to socialize more than she does now.  (AR 41.)  Plaintiff has a rescue dog and will take it for a half mile walk.  (AR 41.)  When she gets home she feeds her other three dogs.  (AR 41.)  She has breakfast and will take a nap or rest.  (AR 41.)  Then she sees what the day holds, some days she is up and some days she is down.  (AR 41.)  A good day is any day where she can get all her dishes done and do her laundry.  (AR 51.)  She had three good days the week of the hearing.  (AR 51.)  Since September 11, 2013, Plaintiff estimates that seventy-five percent of her days are bad days.  (AR 52.)

Lately, Plaintiff has been sleeping ten to thirteen hours per day.  (AR 41.)  She may fall asleep after she feeds the dogs about 9:00 or 10:00 and then not get up until 1:00 or 3:00.  (AR 41.)  Plaintiff will get up about 6:00 or so and then will go back.  (AR 41.)  She is normally up a little

before 9:00 and then will go back to bed.  (AR 41.)  Plaintiff likes the house to be quiet because of her hearing.  (AR 41.)  She just listens to her dogs to make sure everything is okay and putters around the house.  (AR 41.)

Plaintiff's previous work was about ninety percent data entry.  (AR 42.)  She also answered the phone and did some receptionist work.  (AR 42.)

Plaintiff's hands go numb throughout the day and at night.  (AR 42.)  If Plaintiff drives to Fresno her hands will hurt for about three days.  (AR 42.)  The pain starts in her hands and then goes into her wrist and up through her forearm and occasionally into her shoulder.  (AR 42.)  Both hands are about equal.  (AR 42.)  Plaintiff has braces that she wears at night and through the day.  (AR 42.)  She does not like to wear them in public because it draws attention to her.  (AR 42-43.)  The braces help.  (AR 43.)

Plaintiff's neck is better than it was.  (AR 43.)  Sometimes when she is stressed her neck will begin to hurt.  (AR 43.)  Whether the pain is constant or comes and goes depends on what stress is going on in her life.  (AR 43.)  The pain is very low on a scale of one to ten because she does not do much.  (AR 48.)  Her pain is worse when the weather is cooler and windy like it was on the day of the hearing.  (AR 48.)

Plaintiff used to have an ankle spur, but it has been resolved and she does not have any problems with it.  (AR 49.)  The doctor recommended that Plaintiff have carpal tunnel surgery and was told that it will help nine out of ten people but she did not think that the odds were good.  (AR 49.)  She talked to people who told her that the surgery helped but did not take care of the problem.  (AR 49.)  She was supposed to have another surgery, but it frightened her so she cancelled it.  (AR 49-50.)  The doctors have recommended injections, but Plaintiff will not have injections because she is afraid of cancer.  (AR 50.)  Plaintiff has gone to physical therapy and had acupuncture.  (AR 50.)  She gets a message a couple times a month.  (AR 50.)  She has a Prowave that helps with the carpal tunnel.  (AR 50-51.)

If Plaintiff sits too long the cords in her leg will begin to hurt.  (AR 43.)  Lying down too long also causes the same problem.  (AR 43.)  Plaintiff must be cautious what she does.  (AR 43.)  She does not do as much as she used to do.  (AR 43.)  Plaintiff's low back pain comes and goes, if

she pays attention and is cautious it is okay.  (AR 43.)  The same with her neck.  (AR 44.)  She is just cautious and takes her time.  (AR 44.)  Lying down is a comfortable position for her.  (AR 44.)  She will lie on her back, but must have a pillow.  (AR 44.)  Plaintiff is taking medication that helps, but she tries not to take them too much because she does not want to get addicted or have side effects.  (AR 44, 45.)  Plaintiff uses ice packs, a hot water bottle, cream, and a stick for her arms and legs.  (AR 44.)  Plaintiff has excruciating pain in her legs due to the cord in her leg tightening down to the calf.  (AR 45.)  Her right leg is worse than the right and she has had acupuncture and massage for it.  (AR 45.)

Plaintiff has received mental health care for about a year and a half.  (AR 52.)  The mediation and counseling sessions help.  (AR 52.)  Her symptoms are about the same.  (AR 52.)  If Plaintiff were to look for work she would have nightmares, crying spells, and anxiety.  (AR 53.)  She is afraid of people.  (AR 53.)  She started looking for a job the prior week because of her income but had not found anything.  (AR 53.)  She was looking for work as a cashier.  (AR 53.)  She would only be able to work for a couple of hours.  (AR 53.)  She only has anxiety when she looks for work or talks about her work history.  (AR 53.)

Plaintiff can carry a gallon of water, but cannot do it a lot.  (AR 46.)  She does not sit very often in a regular chair.  (AR 46.)  She can sit thirty to forty-five minutes.  (AR 46.)  Plaintiff can stand for a few hours on and off but not constantly.  (AR 46.)  It takes about 20 to 30 minutes to walk her dog a half mile because that is his maximum.  (AR 46.)  Thirty minutes is the most she can walk.  (AR 47.)  She has difficulty bending over to pick something up but thinks it is just part of aging.  (AR 47.)  She takes her time.  (AR 47.)  Plaintiff does not climb stairs if she can help it, but when she does she uses the rail to help pull her up.  (AR 47.)  She does not have any problem picking up small items because she does not do a lot with her hands.  (AR 47.)  But there have been times when it was hard to pick things up and she had to use two hands to pick up a glass of water.  (AR 47.)  She had more difficulty when she was working and got to where she was dropping things.  (AR 47.)

Plaintiff settled her worker's compensation case.  (AR 47-48.)  She did not want to but felt like she was forced into signing.  (AR 48.)  She received a lump sum and did not get ongoing

medical care.  (AR 48.)

Judith L. Najarian, a vocational expert ("VE") also testified at the hearing.  (AR 54-58.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2016.

- Plaintiff has not engaged in substantial gainful activity since September 11, 2013, the alleged onset date.

- Plaintiff has the following severe impairments: mild right carpal tunnel syndrome, mild cervical degenerative joint disease, history of lateral epicondylitis, and morbid obesity.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk 6 to 8 hours and sit 6 to 8 hours in an 8 hour workday; occasionally stoop, crouch, crawl, climb, kneel, and balance; and occasionally perform forceful gripping and grasping.

- Plaintiff is capable of performing past relevant work as a data entry clerk/receptionist.  This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

- Plaintiff has not been under a disability as defined in the Social Security Act from September 11, 2013, through the date of this decision.

(AR 22-30.)

**III.**

**LEGAL STANDARD**

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply

by isolating a specific quantum of supporting evidence." <u>Hill</u>, 698 F.3d at 1159 (quoting <u>Robbins v. Social Security Administration</u>, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. <u>See</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

**IV.**

**DISCUSSION AND ANALYSIS**

Plaintiff contends that the ALJ erred by finding her mental impairments not severe at step two, in evaluating the opinions of her treating providers, and in failing to consider her work history in assessing Plaintiff's credibility.

**A.      Any Error at Step Two Would be Harmless**

Plaintiff alleges that the ALJ erred in finding that her mental impairments were non-severe at step two. Plaintiff contends that Plaintiff's treating psychiatrist's opinion demonstrates that she has mental limitations precluding her ability to work and that the ALJ erred by rejecting the opinion. Further, Plaintiff argues that any consideration at step 4 did not correct the error because the ALJ did not include any limitations for her mental impairments in the residual functional capacity. Defendant counters that the ALJ properly considered the medical record and properly relied on the opinion of Dr. Hirokawa who examined Plaintiff and the treatment history to find that Plaintiff did not have a mental impairment that would affect her ability to work. Further, Defendant argues that any error at step two would be harmless as the ALJ continued and discussed Plaintiff's mental impairments at step four.

1.      <u>Substantial Evidence Supports Step Two Finding</u>

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual['s] ability to work.' " <u>Smolen</u>, 80 F.3d at 1290 (citations omitted). Step two is a "de minimis screening devise to dispose of groundless claims." <u>Id.</u> An ALJ can only find that claimant's impairments or combination of impairments are not severe when his conclusion is clearly established by medical evidence. <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir 2005)

7

(quoting S.S.R. 85-28).  In considering an impairment or combination of impairments, the ALJ must consider the claimant's subjective symptoms in determining their severity.  <u>Smolen</u>, 80 F.3d at 1290.

Symptoms are not medically determinable physical impairments and cannot by themselves establish the existence of an impairment.  Titles II & Xvi: <u>Symptoms, Medically Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations</u>, SSR 96-4P (S.S.A. July 2, 1996).  In order to find a claimant disabled, there must be medical signs and laboratory findings demonstrating the existence of a medically determinable ailment.  <u>Id.</u>  "[R]egardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings . . ..  In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process."  <u>Id.</u>

The ALJ found that Plaintiff's medically determinable mental impairments of depression and PTSD did not cause more than minimal limitation on her ability to perform basic mental work activities and were therefore nonsevere.  (AR 22.)  The ALJ found that Plaintiff's mental impairments caused no restriction on her activities of daily living, mild restriction in social functioning and concentration, persistence, and pace, and no extended periods of decompensation.  (AR 23.)  The ALJ noted that although the record noted depression on occasion, Plaintiff improved with medication.  (AR 23.)  Although Plaintiff was seeing a counselor, the record contained minimal notes regarding her sessions.  (AR 23.)

Plaintiff began seeing Dr. Sievert in January 2015.  (AR 343.)  Plaintiff originally presented with a euthymic[2] and normal mood and affect.  (AR 343.)  Plaintiff's thought processes were organized, goal-directed, and linear.  (AR 343.)  She had no perceptual disturbances.  (AR 343.)  She was alert and her long-term and short-term memory and reasoning were intact.  (AR

---

[2] Moderation of mood, not manic or depressed.  Stedman's Medical Dictionary 678 (28th Ed. 2006).

343.) She had good judgment and insight was full and intact. (AR 343.) The treatment records indicate that Plaintiff saw Dr. Sievert regularly although there was a three to four-month gap in treatment, but other than her reports of anxiety and depression, the record generally contain no findings other than occasional anxiety and depression with no new symptoms. (AR 333, 334, 335, 336, 337, 338, 339, 340, 341, 342.) As the ALJ noted, during this same time period, Plaintiff stated she was doing well and regularly reported no anxiety and depression to her physician; and the objective findings in the medical record note normal mood and that her depression was controlled by medication. (AR 400, 401, 403, 404, 406, 407, 409, 410, 412, 413, 416, 419-420, 425, 427.) Other records during this same time period contain similar reports of no depression or anxiety. (AR 451, 455.) Substantial evidence supports that ALJ's findings that Plaintiff's mental health impairments did not cause more than minimal limitations on her ability to perform work activities.

However, to the extent that the ALJ's failure to find Plaintiff's mental impairments severe at step two, such error would be harmless as the ALJ considered Plaintiff's mental impairments in determining Plaintiff's residual functional capacity. Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012).

2. The ALJ Provided Specific and Legitimate Reasons to Reject Medical Opinion

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). In general, a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted). If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)).

"If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.' " Orn

v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2). "In that event, the ALJ is instructed by § 404.1527(d)(2) to consider the factors listed in § 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician." Orn, 495 F.3d at 632. The factors to be considered include the " '[l]ength of the treatment relationship and the frequency of examination' by the treating physician, the '[n]ature and extent of the treatment relationship' between the patient and the treating physician, the '[s]upportability' of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole.' " Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1527(c)(2)-(6)). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Ghanim, 763 F.3d at 1161 (quoting Orn, 495 F.3d at 631).

In considering Plaintiff's residual functional capacity, the ALJ considered the May 2013 consultative examination of Dr. Hirokawa. (AR 27, 677-682.) Plaintiff reported that she was experiencing depression due to work stress, including yelling and abuse by her supervisors. (AR 27, 678.) Dr. Hirokawa noted that Plaintiff reported that she was not receiving any mental health treatment. (AR 27, 679.) She reported having many friends and described her relationships as good. (AR 27, 679.) Plaintiff reported that she was involved in church, baseball games, and with friends. (AR 679, 680.) On examination, Dr. Hirokawa found that Plaintiff appeared her stated age with good hygiene. (AR 27, 680.) She had fair eye contact. (AR 27, 680.) Facial expressions were appropriate and behavior was cooperative throughout the evaluation. (AR 27, 680.) Attitude was pleasant and there were no vocal or motor abnormalities noted. (AR 27, 680.) Plaintiff's stream of mental activity and association of though were within normal limits. (AR 27, 680.) Articulation was clear; velocity and volume were normal; quantity of speech was appropriate; and vocabulary and pronunciation were within normal limits. (AR 27, 680.) Thought content was appropriate with no evidence of delusional thinking noted. (AR 27, 680.) Plaintiff's mood was fair and affect was appropriate to content. (AR 27, 681.) Plaintiff was fully oriented, and intellectual functioning appeared to be within the average range. (AR 27, 681.) Her remote memory appeared intact based upon the patient's ability to recall various events throughout her life

with adequate detail. (AR 27, 681.) Concentration for conversation was adequate, and judgment and insight were within normal limits. (AR 27, 681.)

Dr. Hirokawa found that Plaintiff's symptoms of depression and anxiety were in partial remission and she is able to function at work without problems. (AR 27, 681.) Plaintiff's predominant stressor at work was due to good faith personnel action in which her supervisor was correcting her behavior and giving her feedback. (AR 27, 681.) Plaintiff was diagnosed with adjustment disorder with anxiety and depressed mood in partial remission and Dr. Hirokawa opined a Global Assessment Function[3] ("GAF") score of 73.[4] (AR 27, 681.) Dr. Hirokawa found that Plaintiff had no psychological injury. (AR 796.)

The ALJ gave significant weight to Dr. Hirokawa's report and the GAF findings because they are consistent with the overall record indicating that Plaintiff has only mild mental symptoms. (AR 27.) The ALJ found that Plaintiff has only received minimal mental health treatment and her symptoms do not seem to more than minimally impair her functioning. (AR 27.) The only mental health treatment in the record demonstrates visits with a licensed marriage and family therapist on eight occasions from September 2014 through January 2015, (AR 344-345, 346, 347, 348, 349, 350, 351, 352); and Dr. Sievert on eleven occasions from January 26, 2015 through April 2015 and October 2015 through March 4, 2016, (AR 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343).

The ALJ also considered a December 2015 medical source statement completed by Dr. Sievert. (AR 29, 314.) Dr. Sievert noted a diagnosis of posttraumatic stress disorder with a fair prognosis. (AR 29, 314.) The ALJ noted that in a check-box form the doctor opined that Plaintiff's condition did not preclude her from understanding and remembering very short and simple instructions but precluded her from maintaining attention for two-hour segments five percent of the workday. (AR 29, 314.) Dr. Sievert also indicated that Plaintiff would be precluded

---

[3] "A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations." Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000)).

[4] A GAF score of 61 to 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning. Macias v. Colvin, No. 1:15-CV-00107-SKO, 2016 WL 1224067, at *7 (E.D. Cal. Mar. 29, 2016).

from sustaining an ordinary routine without special supervision, completing a normal workday/workweek without psychological interruptions, and getting along with coworkers and peers without distracting them for 15 percent or more of the workday. (AR 29, 314.) The ALJ gave the opinion little weight finding it not consistent with the treatment record that indicates the claimant has occasional mental symptoms with little mental health treatment.[5] (AR 29.) As discussed above, during this time period the medical records reveals that Plaintiff reported to various physicians no depression and anxiety and objective findings show normal mood and that her depression was controlled by medication. (AR 400, 401, 403, 404, 406, 407, 409, 410, 412, 413, 416, 419-420, 423, 425, 427, 451, 455, 460.)

Plaintiff appears to argue that Dr. Sievert's opinion limited Plaintiff to only being able to understand and remember very short and simple instructions which would require a finding of disability based on her age. However, the opinion itself merely states that Plaintiff is not precluded from understanding and remembering short and simple instructions and does not address Plaintiff's ability to understand and perform detained instructions or tasks. (AR 314.) Further, the only objective findings by Dr. Sievert were on January 26, 2015. (AR 343.) Dr. Sievert found that

---

[5] To the extent that Plaintiff argues that the ALJ committed reversible error by failing to discuss the factors in 20 C.F.R. 404.1527(c). This Court agrees with several other district courts that have concluded that Trevizo does not require an explicit analysis of the factors in section 416.927(c). See Standen v. Berryhill, No. 2:16-cv-1267-EFB, 2017 WL 4237867, at *8 (E.D. Cal. Sep. 25, 2017); Torres v. Berryhill, No. 3:17-cv-01273-H-PCL, 2018 WL 1245106, at *5 (S.D. Cal. March 9, 2018); Hoffman v. Berryhill, 2017 WL 3641881, at *4 (S.D. Cal. Aug. 24, 2017) report and recommendation adopted, 2017 WL 4844545 (S.D. Cal. Sep. 14, 2017)). While there does not have to be an explicit recitation of the factors, the ALJ's decision must reflect that the ALJ considered the factors. Id. Upon review of the ALJ's decision, the Court finds that the ALJ did consider the factors listed in section 416.927(c) in determining the weight to be provided to Dr. Sievert's opinion. For example, the ALJ noted that Plaintiff had received little mental health treatment. (AR 23.) Plaintiff had been receiving mental health treatment for over a year. (AR 24.) Plaintiff had seen Dr. Sievert monthly. (AR 29.)

Finally, the ALJ's decision will not be reversed for errors that are harmless. Burch, 400 F.3d at 679. Here, Dr. Sievert's records do not contain object findings, but generally report Plaintiff's complaints and reflect adjustments to her medication. The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957. For example, on December 3, 2015, Dr. Sievert opined that the reason for Plaintiff's limitations is marked anxiety. (AR 314.) But on November 10, 2015, November 20, 2015, and December 22, 2015, Plaintiff reported that she was having no anxiety or depression, consistent with the medical record for the entire time period in which Dr. Sievert was treating Plaintiff. (AR 407, 410, 413.) On November 16, 2015, Dr. Sievert noted that Plaintiff was not experiencing any new symptoms, she was doing well, and her mood was euthymic, irritable, and fretful. (AR 337.) So, while Dr. Sievert did note that Plaintiff was anxious, depressed, or fretful, he also reported no new symptoms and Plaintiff herself was reporting to her other physicians that she was not experiencing any depression or anxiety. Since Dr. Sievert's opinion is unsupported by his treatment notes, and by Plaintiff's reports to other doctors that she is not experiencing anxiety and depression, any failure to address his treatment records themselves is harmless.

Plaintiff's thought processes were organized, goal directed, and linear. (AR 343.) She had no perceptual disturbances. (AR 343.) Plaintiff was alert and oriented and her long term and short-term memory were intact. (AR 343.) Plaintiff had good judgment and insight, and her reasoning was intact. (AR 343.) Plaintiff has not pointed to any objective findings in the medical record that would limit her to short and simple tasks.

The ALJ provided specific and legitimate reasons to reject the opinion of Dr. Sievert. The Court finds that the ALJ did not err in determining that Plaintiff only had mild mental impairments that would not affect her ability to work.

## B. Medical Opinions

Plaintiff argues that the ALJ erred by failing to provide legitimate and specific reasons to reject the opinions of Drs. Tenn and Boniske. Defendant counters that the ALJ was tasked with evaluating the contrasting opinions of seven different physicians as to Plaintiff's physical functional capacity and properly assessed that Plaintiff was less limited than opined by Drs. Tenn and Boniske but more limited than opined by Drs. Mayor, Ha'Eri, Vesali, Fast, and Pong. Defendant contends that the ALJ provided legitimate and specific reasons to reject the opinions of Drs. Tenn and Boniske. Defendant argues that the ALJ properly gave little weight to the opinions of Drs. Tenn and Boniske because they did not explain the basis for their opinions and were mostly reciting Plaintiff's subjective complaints.

In this instance, the ALJ considered the conflicting opinions of multiple physicians. Dr. Sanders, an agreed medical examiner, examined Plaintiff in October 2010 for her Workman's Compensation claim regarding her continual hand pain and opined that Plaintiff could continue her usual and customary job. (AR 25, 601-637.) On August 6, 2013, Plaintiff went to the emergency room complaining of hand pain that was 9 out of 10, and weakness. (AR 25, 683.) She returned to the emergency room three days later, and findings were normal other than positive Phalen and Tinel signs. (AR 688.) The physician noted that Plaintiff did not want to work, but that there were no findings to suggest an acute problem or debilitating carpal tunnel. (AR 25, 689.)

In March 2014, electrodiagnostic studies showed a delay in the right median sensory distal latency, but the remaining bilateral upper extremity nerve conduction studies were normal with

normal upper limb needle exam and normal cervical paraspinal muscle needle examination. (AR 26, 304.) Dr. Wiens noted that the findings were consistent with mild right carpal tunnel with no evidence of peripheral neuropathy or cervical radiculopathy. (AR 26, 304.)

Plaintiff had a nerve conduction study in January 2015, that showed right carpal tunnel of mild severity and normal NCVs of the upper left extremity. (AR 26, 331.) Plaintiff received treatment from Dr. Tenn from 2008 through 2013 who provided a medical source statement in October 2013, indicating that her problem was permanent and a repetitive use condition.[6] (AR 26, 565-569.) Dr. Tenn opined that Plaintiff should avoid repetitive griping and typing for prolonged periods greater than one hour and should take frequent breaks. (AR 26, 568.) Dr. Tenn had placed Plaintiff on temporary duty restrictions prior to the alleged onset date with several notes to excuse Plaintiff from work in 2013. (AR 26-27, 501, 502, 572, 794, 797, 798, 799.)

Plaintiff had a consultative examination by Dr. Vesali in March 2014. (AR 27, 294-296.) Tinel sign was positive on the right, but she deferred the Phalen's test due to pain in the left distal forearms. (AR 27, 296.) Plaintiff had tender points on the bilateral shoulders, biceps, triceps, forearms and hands, but there was no obvious inflammation in the upper or lower extremities. (AR 27, 296.) Motor strength, sensation, and reflexes were normal. (AR 28, 296.) Dr. Vesali diagnosed Plaintiff with myofascial upper extremity pain, possibly right carpal tunnel syndrome. (AR 28, 296.) Dr. Vesali opined that Plaintiff could stand, walk, and sit without limitation; should be able to lift and carry 50 pounds occasionally and 25 pounds frequently; crouch and kneel and frequently perform other postural activities due to a history of knee surgery; and should be able to frequently perform manipulative activities. (AR 28, 296.)

The ALJ considered that Plaintiff had an independent medical evaluation by Dr. Ha'Eri on May 20, 2014. (AR 28, 1003-1010.) Dr. Ha'Eri found that on visual examination of the upper extremities there was no deformity, swelling, or atrophy. (AR 28, 1006.) Both wrists had full

---

[6] Plaintiff argues that the ALJ did not consider the factors in section 416.927(c). However, the ALJ noted that Dr. Tenn had been treating Plaintiff from September 2008 and her last visit was in September 2013. (AR 26.) Dr. Tenn had diagnosed Plaintiff with tenosynovitis of the wrists and forearms bilaterally and myalgias of the upper back and neck. (AR 26.) The ALJ also noted that Dr. Tenn had found that Plaintiff's problem was a repetitive use condition and had placed her on light duty on several occasions and excused her from work on several occasions. (AR 27.) Finally, the ALJ found that Dr. Tenn's opinion was not consistent with the other medical evidence in the record. (AR 25-29.)

range of motion. (AR 28, 1006.) Tinel signs were positive over the bilateral carpal tunnels, but Phalen's test was negative bilaterally. (AR 28, 1006.) Neurological examination of the upper extremities showed no deficits, there was no decreased sensation, motor power was 5/5, and reflexes were bilaterally present and symmetrical. (AR 28, 1006.) Dr. Ha'Eri diagnosed Plaintiff with bilateral wrist and hand tendinitis, resolved; and probable carpal tunnel syndrome finding that no further treatment was needed. (AR 28, 1007.) He opined that Plaintiff's condition was the same since October 28, 2010, when Dr. Sanders found Plaintiff permanent and stationary and that Plaintiff was capable of performing her prior job. (AR 28, 1010.)

Nurse practitioner Gleason and rheumatologist Boniske completed a treating source physical statement of disability form, dated November 2014.[7] (AR 28, 394-398.) The form indicated that Plaintiff had been seen on two occasions with complaints of upper extremity pain radiating from the elbows into the forearms and hands. (AR 28, 394.) Objective findings indicated bilateral epicondylitis. (AR 28, 394.) Plaintiff was treated with elbow bands and it was recommended that she rest her extremities. (AR 28, 395.) Plaintiff was unimproved and it was opined that she was unable to perform repetitive movements due to epicondylitis. (AR 28, 395-396.) It was also opined that Plaintiff could not perform the data entry described in her job description due to severe arm pain from epicondylitis and would not be able to perform her job effectively. (AR 28-29, 298.)

The ALJ considered that Dr. Mayors completed a physical source statement, dated December 2015, indicating Plaintiff had mild right and left carpal tunnel syndrome with good prognosis. (AR 29, 316.) Dr. Mayors opined that Plaintiff could sit and stand/walk at least six hours each in an eight-hour workday; could frequently lift up to 50 pounds; and did not have significant limitation in reaching handling or fingering. (AR 29, 316.)

Lastly, the ALJ considered the opinions of the agency physicians, Drs. Fast and Pong who concluded that Plaintiff could perform medium work with frequent postural activities. (AR 29, 65-

---

[7] Plaintiff argues that the ALJ failed to consider the factors in section 416.927(c). However, the ALJ noted that Dr. Boniske was a rheumatologist, had seen Plaintiff for two visits, and was not able to determine if Plaintiff was permanently disabled from her occupation. (AR 28-29.)

69, 77-80.)

The Court finds no merit to Plaintiff's argument that the ALJ considered the physician opinions in isolation from each other and failed to consider the consistency of the record as a whole. Here, the treating physicians, Drs. Tenn, Boniske, and Mayors disagreed regarding the limitations caused by Plaintiff's impairments and the ALJ found that the medical record did not contain much objective evidence of restriction. (AR 27.) Further, the examining physicians, while noting some objective findings, all found that Plaintiff was not limited in her ability to perform her prior job. Finally, the agency physicians both found that Plaintiff retained the residual functional capacity to perform her prior work.

1.    <u>The ALJ provided specific and legitimate reasons to reject the opinions of Drs. Tenn and Boniske</u>

Plaintiff argues that the ALJ erred by failing to provide specific and legitimate reasons to reject the opinion of Drs. Tenn and Boniske. The ALJ considered the opinions of Dr. Tenn and Boniske.

> David T. Tenn M.D., a provider at Palm Occupational Clinic, completed a medical source statement dated October 2013 [AR 565-569]. He indicated pain in the hands wrists and the arms bilaterally [AR 565]. He noted a diagnosis of tenosynovitis of the wrists and forearms bilaterally and myalgias of the upper back and neck [AR 566]. Dr. Tenn first saw the claimant in September 2008 and the last visit was in September 2013 [AR 566]. He indicated the claimant's problem was a permanent problem and a repetitive use condition [AR 566]. He opined that the claimant should avoid repetitive gripping and typing for prolonged periods greater than one hour and should take short breaks frequently [567].
>
> Dr. Tenn also indicated the claimant could not perform repetitive lifting or lifting from below the waist [AR 568]. He noted the claimant had conflict with her supervisors and she felt stress and anxiety [AR 569]. He also noted the claimant needed a five-minute break every 30-40 minutes from keyboarding and writing [569]. Dr. Tenn also indicated temporary work restrictions prior to the alleged onset date. He opined the claimant needed five minutes break every hour to do upper back/neck exercises in February 2013 [AR 502]. He placed the claimant on light duty on July 2013 stating the claimant could work five hours a day and must be able to have five minutes break every 1/2 hour and must be able to work at her own pace [AR 501]. In August he opined the claimant could not lift push or pull over five pounds and was limited to using her hands four hours a day with a five minute break every four hours [AR 572]. There are also severe [sic] notes to excuse the claimant from work in 2013 [AR 573].

(AR 26-27.) The ALJ gave Dr. Tenn's opinions limited weight as the overall record indicated a lot of subjective complaints but not much objective evidence of restriction. (AR 27.)

Nurse Colleen Gleason FNP and rheumatologist Charles Boniske M.D. completed a treating source physical statement of disability form dated November 2014 [AR 394-398]. The form indicates the providers first evaluated the claimant in October 2014, she had been seen twice and she had subjective complaints of upper extremity pain radiating from the elbows into the forearms and hands [AR 394, 395]. Objective findings indicated bilateral lateral epicondylitis and they diagnosed the claimant with lateral epicondylitis and hypothyroidism [AR 394]. They treated the claimant with elbow bands and recommended she rest her extremities but she was so far unimproved [AR 395]. They opined the claimant was unable to perform repetitive movements due to epicondylitis [AR 396]. They also stated the claimant was unable to perform data entry as described in her job description due to severe pain in the arms from epicondylitis and she would not be able to perform her job effectively [AR 398]. The form notes they could not determine if the claimant was permanently disabled for the duties of her occupation [AR 398].

(AR 28-29.) The ALJ gave this opinion little weight as the form was completed after only two visits to this provider and appears to be mostly based on the claimant's subjective complaints. (AR 29.)

Plaintiff contends that Dr. Tenn's has provided Plaintiff with several work excuses and modifications from July 2012 through October 2013, including that Plaintiff should avoid repetitive gripping and typing for prolonged periods greater than one hour. Plaintiff argues that there are objective findings in the record to support support the opinion of Dr. Tenn. Further, Plaintiff argues that it was unreasonable to reject the opinion of Dr. Boniske because he had only seen Plaintiff on two occasions but to give greater weight to the opinions of Drs. Vesali and Ha'Eri who had only examined Plaintiff on one occasion.

Defendant counters that Plaintiff considered the findings in the record as a whole, the objective findings and the lack of objective findings, and gave less weight to Drs. Tenn and Boniske's opinion because they relied heavily on Plaintiff's own complaints. Defendant argues that Dr. Tenn and Boniske's opinions are provided on a preprinted questionnaire in which most of the questions are left blank and does not explain how tenderness caused the allegedly disabling functional limitations.

On August 5, 2010, Dr. Tenn noted that exam of both upper extremities shows mainly normal findings with the most being the subjective complaints themselves. (AR 504.) The gross neurological, vascular, and motor examinations were also within normal limits. (AR 504.) While there are findings of tenderness, the record from 2010 to 2011 notes generally normal findings

with good grip strength and no neurological deficits. (AR 507, 510, 511, 933, 934, 935, 937, 945, 955.) Plaintiff returned in 2012 complaining of hand pain, but it is noted that there is no gross swelling or atrophy of her hands or wrists. (AR 918.) Plaintiff was found to have some mild tenderness to palpation over the dorsal and ulnar aspects of the wrists that extended into the forearms but there was no direct elbow tenderness. (AR 918.) Plaintiff had full range of motion of the elbow. (AR 918.) Examination of the hands showed full range of motion of the fingers without any triggering. (AR 918.) She did have increased pain in her wrists and forearms with forceful gripping. (AR 918.) There were no gross sensory deficits noted. (AR 918.)

The record reflects similar findings on subsequent visits. (AR 907, 915.) Plaintiff had some minimal discomfort in the wrist and no crepitus. (AR 915.) Phalen test was negative. (AR 915.) On April 24, 2012, Plaintiff's condition was found to have improved and she was returned to regular duty. (AR 908.)

Plaintiff returned to see Dr. Tenn complaining of hand pain in July 2012. (AR 905.) Plaintiff had no swelling of her hands or wrists. (AR 905.) She had some mild tenderness to palpation over the dorsum of the wrist extending up into the forearms. (AR 905.) There was no palpable crepitus. (AR 905.) Plaintiff had pain with full flexion and full extension of the left wrist. (AR 905.) There were no sensory deficits in the fingers. (AR 905.) Plaintiff had good hand grip strength and no sensory deficits in the hands bilaterally. (AR 905.)

A July 3, 2012 visit reflected no change in her condition with minimal tenderness to palpation over the wrist, no palpable crepitus, and good range of motion and hand grip strength with complaints of pain to flexion and extension. (AR 571, 904.)

In January 2013, Plaintiff returned complaining of back and neck pain. (AR 797, 798, 799.) She was returned to full duty with no restriction on April 18, 2013. (AR 901.)

Plaintiff attended physical therapy for her hand and wrist pain from June to July 2013. (AR 490, 491, 492, 493, 496, 892.) Dr. Tenn returned her to light duty, working 5 hours a day with a 5-minute break every 1/2 hour on July 11, 2013. (AR 501, 572, 794.) On October 15, 2013, Dr. Tenn completed the treating physician's statement of disability. (AR 565-596.)

While Plaintiff was not seen by Dr. Tenn, she did continue to have regular visits with Dr.

Gerges after June 11, 2013, which reflect no abnormal findings. (AR 255, 258, 261, 264-265, 268, 270, 273, 274, 276-77, 279, 282, 285, 400-401, 403-404, 406, 409-410, 416, 419, 423, 427, 429, 431, 435, 440). On August 6, 2013, Plaintiff went to the emergency room complaining of hand pain that was 9 out of 10 and that she was not able to get in to see Dr. Tenn. (AR 683.) On examination, the upper and lower extremities were non-tender with full range of motion. (AR 683.) Plaintiff had full range of motion in the wrists bilaterally and there was no obvious deformity. (AR 683.) Motor and sensory exams were non-focal; and Plaintiff had a negative Tinel and Phalen test. (AR 683.)

Plaintiff returned to the emergency room three days later, and findings were normal other than positive Phalen and Tinel signs. (AR 688.) The physician noted that Plaintiff did not want to work, but that there were no findings to suggest an acute problem or debilitating carpal tunnel. (AR 689.)

Plaintiff had a comprehensive examination by Dr. Vesali on March 19, 2014, which found Plaintiff to be capable of performing medium work with no manipulative limitations. (AR 294-296.) On May 20, 2014, Dr. Ha'Eri conducted a medical evaluation finding that although Plaintiff had positive Tinel sign over the bilateral carpal tunnel she retained the ability to perform her job as an assistant. (AR 1006, 1010.)

On October 1, 2014, Dr. Boniske examined Plaintiff and noted that she had 5/5 motor strength proximately and distally with no focal deficits noted. (AR 391.) Dr. Boniske noted good grip strength with no synovitis in the hands, wrists, or elbows. (AR 391.) Plaintiff's wrists were non-tender with positive Finklestein on the right. (AR 391.) Her elbows had normal range of motion, with some tenderness to palpation over both lateral epicondyles symmetrically. (AR 391.) Dr. Boniske found that Plaintiff's examination was most consistent with epicondylitis which he thought explained most of her upper extremity complaints. (AR 391.) He recommended some cross-friction massage along the lateral epicondyles followed by ice and stretches and suggested that she use her tennis elbow bands whenever she is doing anything with her arms. (AR 392.)

On November 10, 2014, Plaintiff was examined by Family Nurse Practitioner Gleason. (AR 389.) She was found to have good grip strength with no synovitis in her hands and elbows.

(AR 389.)  Range of motions in the elbows was normal.  (AR 389.)  She was tender to palpation over both lateral epicondyles symmetrically.  (AR 389.)  Nurse Practitioner Gleason noted that her exam was consistent with symmetric lateral epicondylitis and Plaintiff was instructed to purchase elbow bands.  (AR 389.)  Nurse Practitioner Gleason noted that she was happy to complete Plaintiff's disability paperwork because her bilateral epicondylitis made her unable to do the data entry required by her job description.  (AR 389.)  On November 12, 2014, Dr. Boniske and Nurse Practitioner Gleason completed a form stating Plaintiff had subjective complaints of pain in the upper extremities radiating from the elbows into the forearms and hands.  (AR 394.)  She had bilateral lateral epicondylitis.  (AR 394.)  Plaintiff had been treated with elbow bands and was to rest her extremities.  (AR 395.)  Plaintiff was unable to perform repetitive reaching, pulling, pushing, twisting, grasping, handling, or repetitive movements.  (AR 396.)  Plaintiff was unable to perform data entry due to severe pain in the arms from epicondylitis.  (AR 398.)

On January 8, 2015, Plaintiff was evaluated by Dr. Han who found obvious thenar atrophy on the pollicis brevis belly with moderate to significant swelling of the bilateral volar distal forearm worse on the right than the left.  (AR 323.)  There was slight swelling on the bilateral radial first CMC joint area with radial subluxation of the thumb metacarpal bases off the trapezium with early compensatory hyperextension at the MCP joints.  (AR 323.)   Plaintiff had negative bilateral Adson and Roos sign.  (AR 323.)  There was no tenderness over the upper medial arm and volar pronator forearm areas, the medial and lateral epicondylar areas, or the bilateral cubital tunnel but she did have positive elbow flexion test.  (AR 323-324.)  Plaintiff had positive Tinel and Phalen sign across the bilateral carpal tunnel.  (AR 324.)  Phalen and Durkin's maneuver elicited burning pain radiating up along the volar forearm and upper lateral arm areas, but none over the Guyon canal.  (AR 324.)   There was no pain or tenderness over the bilateral first dorsal compartment with negative Finkelstein's test.  (AR 324.)  Plaintiff had moderate tenderness over the thumb basal joint and grinding maneuver elicited moderate-to-significant pain and discomfort left worse than the right.  (AR 324.)  There was no pain or tenderness over the bilateral thumb MCP joints and stressing the collateral ligament and volar plate did not reveal any instability.  (AR 324.)  There was no pain over the bilateral scaphoid and lunate joint area with negative Watson

test Negative LT shuck test. (AR 324.) There was a negative piano key test. (AR 324.) Plaintiff had normal pronation and supination. (AR 324.) Dr. Han diagnosed Plaintiff with bilateral carpal tunnel syndrome with possible flexor tenosynovial proliferation and thumb basal joint osteoarthritis. (AR 324.) Her most pressing problems was her carpal tunnel and she initially agreed to corticosteroid injections, but then declined. (AR 324.) Plaintiff was to continue to use a protective splint at night and avoid any heavy strenuous use of her hand. (AR 324.)

Plaintiff had a nerve conduction study on January 29, 2015, which showed right carpal tunnel syndrome of mild severity and normal NCVs of the left upper extremity. (AR 331.) Plaintiff had an examination by Dr. Han on February 10, 2015, with findings similar to the prior visit. (AR 322.) She declined any surgical intervention and was to continue using the protective brace and anti-inflammatories as needed. (AR 322.) On April 2, 2015, Plaintiff saw Dr. Han complaining of worsening symptoms. (AR 321.) Plaintiff decided that she wanted treatment and was to be scheduled the following week. (AR 321.) Plaintiff followed up with Dr. Han on May 26, 2015, and July 21, 2015, and was to be scheduled for surgery. (AR 319, 320.)

On September 22, 2015, Plaintiff was seen by Dr. Majors complaining of hand pain. (AR 454.) Plaintiff had full range of motion of the elbow, wrist, fingers, and thumb. (AR 456.) Dr. Majors found no atrophy of the hands. (AR 456.) Strength of the thumb adduction to the palm was measured 5 out of 5. (AR 456.) Provocative maneuvers at the elbow and wrist were nontender. (AR 456.) The carpal tunnel Tinel test and volar wrist flexion compression test were positive. (AR 456.) The elbow flexion compression test and cubital tunnel Tinel tests were negative. (AR 456.)

Dr. Majors completed a physical source statement on December 18, 2015, finding that Plaintiff had mild bilateral carpal tunnel syndrome and had no reaching, handling, or fingering limitations. (AR 316.)

Plaintiff saw Dr. Majors on January 5, 2016, and a carpal tunnel Tinel test on the right side was positive. (AR 452.) A volar wrist flexion compression test on the right side was positive. (AR 452.) A wrist exam on the right side was nontender. (AR 452.) Plaintiff elected to have surgery. (AR 452.)

While Plaintiff argues that it is speculative that Drs. Tenn and Boniske's opinions were based on Plaintiff's subjective complaints, the ALJ made a reasonable interpretation based on the lack of objective findings and the notations in the medical record. Specifically, Dr. Tenn noted that the most objective findings were based on Plaintiff's subjective complaints. (AR 504.) Further, although Dr. Tenn completed the report on October 15, 2013, his last visit with Plaintiff was on March 7, 2013, for her back issues and there are no findings as to Plaintiff's hand or arm complaints. (AR 798.) The last visit which reflects any examination of Plaintiff's hands and arms is on July 12, 2012, more than a year prior to the issuance of the opinion and at that time he found only mild tenderness to palpation of the wrist and pain with full flexion and extension of the left wrist. (AR 905.)

Further, while Dr. Boniske diagnosed Plaintiff with epicondylitis, the treatment notes, while indicating that Plaintiff was complaining of severe pain in her hands and wrists, do not reflect such findings. (AR 389, 391-392.) The report itself states that Plaintiff's subjective complaints are pain in the upper extremities, radiating from the elbows into the forearms and hands with radiation to the neck that comes and goes. (AR 398.) Although the report indicates that Plaintiff is unable to perform data entry due to severe pain in the arms due to epicondylitis, the treatment notes only indicate tenderness to palpation over both lateral epicondyles symmetrically. (AR 392, 389.) The ALJ properly determined that the opinions of Drs. Tenn and Boniske were based on Plaintiff's subjective complaints, rather than the objective findings that are contained in the treatment notes.

An ALJ can reject a physician's opinion that is premised on a claimant's subjective complaints that have been properly discounted. Fair v. Bowen, 885 F.2d 597, 605 (1989). As discussed below, the ALJ properly found that Plaintiff's subjective complaints of pain were not credible.

### C. Claimant Credibility

Plaintiff argues that the ALJ erred by not considering her attempts to work in finding that she was not credible. Defendant counters that Plaintiff has not identified the testimony that she claims invalidate the residual capacity finding and that the ALJ accepted many of Plaintiff's claims

and incorporated them into the opinion, such as by limiting Plaintiff to occasional forceful gripping and handling based on her testimony that she had difficulty grasping objects. Finally, Defendant argues that the regulations do not require the ALJ to discuss a plaintiff's attempts to work when addressing credibility and even if they did any such error would be harmless as the ALJ provided clear and convincing reasons to reject the symptom testimony.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn, 495 F.3d at 635 (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina, 674 F.3d at 1112. The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Then "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015). "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements

concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . ..." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). The district court is constrained to review those reasons that the ALJ provided in finding the claimant's testimony not credible. Brown-Hunter, 806 F.3d at 492.

Here, Plaintiff has not challenged the reasons that the ALJ provided to reject Plaintiff's symptom testimony and therefore any challenge to such reasons is waived. The ALJ found that Plaintiff has declined injections and surgery and has opted for conservative treatment, including protective splints, anti-inflammatory medications, and avoiding heavy strenuous use. (AR 24, 26.) Evidence of conservative treatment is sufficient to discount a claimant's testimony regarding the severity of the impairment. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).

The ALJ provided a clear and convincing reason to find that Plaintiff's symptom testimony was not credible. To the extent that Plaintiff argues that the ALJ did not consider her efforts to continue working, the ALJ did consider that since 2008, Plaintiff has been seeing Dr. Tenn who had found her to have a repetitive problem and that she has been taken off work and placed on light duty several times. (AR 26.) Further, to the extent that there was any such error, it would be harmless as the ALJ provided clear and convincing reasons for the credibility finding.

The ALJ also noted that Plaintiff stated that she was either going to quit or be fired. (AR 25, 27.) On February 19, 2013, Plaintiff reported to Dr. Gerges that she was having issues at work and had been written up and was planning to either quit or be fired. (AR 646.) A claimant's reason for leaving employment is a valid consideration in weighing credibility. Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir.2001). The ALJ could properly consider that Plaintiff was planning to quit due to having issues at work and there are numerous instances in the record where Plaintiff indicated that she was having problems with her supervisor at work and did not want to continue working.

The Court finds that the ALJ provided clear and convincing reasons to find Plaintiff's symptom testimony not fully credible.

///

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in determining that Plaintiff's mental impairments were not severe at step two, in addressing the opinions of Drs. Tenn and Boniske, or in finding Plaintiff's testimony not fully credible.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment is DENIED and Defendant's cross motion for summary judgment is GRANTED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Margie Renfro. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **October 22, 2018**

_____
UNITED STATES MAGISTRATE JUDGE